PER CURIAM.
1 ,This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Gary W. Sheffield, an attorney licensed to practice law in Louisiana but currently on interim suspension pursuant to our order in In re: Sheffield, 00-1632 (La.6/30/00), 765 So.2d 334.
UNDERLYING FACTS
Count I — Respondent’s Federal Conviction
On November 22, 1999, a one count bill of information was filed against respondent in the United States District Court for the Western District of Louisiana. The bill of information charged that between August 14, 1997 and January 22, 1999, respondent violated 21 U.S.C. § 843(a)(2) by using the Drug Enforcement Administration (DEA) registration number that was issued to another person, Dr. John Denser, for the purpose of obtaining Hydrocodone, a Schedule III controlled dangerous substance. On February 25, 2000, respondent pleaded guilty to the charge set forth in the bill of information. He was subsequently fined $5,000 and sentenced to serve four months in prison, followed by one year of supervised release.
Count II — Respondent’s State Conviction
0n Jnl^ 31’ 2001> respondent pleaded guilty in the 19th Judicial District Court for the Parish of East Baton RouSe to five felony counts of Medicaid fraud, a _b™lation of La. R.S. U:70.[1] Respondent’s conviction stemmed from his submission of false and fraudulent claims to the Louisiana Medicaid program for services not rendered but billed to the Medicaid program during the period of November 20, 1997 through September 9, 1998. Respondent was sentenced to serve five years at hard labor on each count to run concurrently. Pursuant to La.Code Crim. P. art. 893, the court deferred the imposition of sentence for five years and placed respondent on active supervised probation for that period, with one year retroactive to the date of sentencing. As special conditions of probation, the court ordered respondent to pay $105,593.07 in restitution, $35,000 in civil monetary penalties, and $25,000 for the costs of investigation and prosecution. Respondent was also required to execute a promissory note in favor of the State of Louisiana Department of Health and Hospitals in the amount of $134,406.93, representing a civil settlement of additional overbillings he made to the Louisiana Medicaid program during the time frame at issue.
Count III — The Riley Matter
In 1990, respondent was retained to handle a personal injury matter for an *663 elderly client, Perry Riley, who suffered from advanced dementia. Respondent also handled certain of Mr. Riley’s personal financial affairs. During the course of the representation, respondent withdrew from various banks a total of $16,089.24 in funds belonging to Mr. Riley and deposited the funds into his client trust account. Respondent then wrote himself a check from the trust account in the amount of $12,503.14 for “repayment [of] advances, investigative fees and expenses.” When respondent was later called upon to account for this payment, he was unable to do so.
|sOn February 12, 1992, respondent settled Mr. Riley’s personal injury matter. However, he failed to prepare a written disbursement sheet identifying the payment of fees and expenses associated with the case, making it impossible to determine whether the client’s funds were handled properly. Respondent also maintained his attorney’s fees in his trust account for several months, thereby commingling his personal funds with funds belonging to his clients.
Count TV — The Harris Matter
In July 1996, Ethel Harris paid respondent $1,000 to handle a real estate dispute. Respondent performed little or no work in the matter and failed to complete the representation. Respondent also failed to refund the unearned portion of the fee paid by his client until October 1999, one year after Mrs. Harris filed a complaint with the ODC.
Count V — The Simmons Matter
In March 1998, Frances Simmons paid respondent $850 to handle a simple succession matter. Respondent performed little or no work in the matter and failed to complete the representation. Respondent also failed to refund the unearned portion of the fee paid by his client.
Count VI — The Coats Matter
In November 1999, Lloyd Coats paid respondent $7,500 to handle a criminal matter. Respondent performed little or no work in the matter and failed to complete the representation, yet he refunded only $3,500 of the fee Mr. Coats paid.
\ ¿Count VII — The Beauregard Matter
In April 1998, Matilda Beauregard paid respondent $1,600 to handle a property transfer in a succession proceeding. Respondent performed little or no work in the matter and failed to complete the representation. Respondent also failed to refund the unearned portion of the fee paid by his clients until April 1999, four months after Ms. Beauregard filed a complaint with the ODC.
Count VIII — The McConathy Matter
In August 1999, James McConathy paid respondent $3,500 to handle a divorce matter. Respondent performed little or no work in the matter and failed to complete the representation. Respondent also failed to refund the unearned portion of the fee paid by his client.
DISCIPLINARY PROCEEDINGS
On December 30, 2003, the ODC filed eight counts of formal charges against respondent,[2] alleging that his conduct as set *664 forth above constituted a violation of Rules 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5 (fee arrangements), 1.15 (safekeeping property of clients or third persons), 1.16(d) (obligations upon termination of the representation), 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer), and 8.4(c) | .^(engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and admitted his misconduct, but requested a hearing in mitigation.[3]

Hearing Committee Recommendation

The hearing committee noted that Counts I through VIII above were admitted pursuant to respondent’s answer to the formal charges. After consideration of the evidence and testimony presented at the mitigation hearing, the committee made the following factual findings with respect to the aggravating and mitigating circumstances present:
Counts I & II (Respondent’s federal and state criminal convictions} — These counts arose out of respondent’s ownership of a medical clinic during what was clearly a stressful and troubled period in his life. Respondent practiced law for many years with his father until his death in 1994. Over the several years that followed, respondent and his wife developed problems and ultimately divorced. Respondent began taking pain pills, sleeping pills in order to sleep and speed in order to work. He developed a physical addiction to one of the medications. He used the DEA registration number of a physician associated with the medical clinic to illegally order controlled dangerous substances for his use.
A whistle-blower lawsuit by a business partner of respondent’s former wife subsequently revealed medical billing improprieties. Records were seized and respondent’s improper ordering of controlled dangerous substances was discovered. Ultimately, respondent pled guilty to illegally using a DEA registration number (Count I) and Medicaid fraud (Count II).
| ^Respondent jointly petitioned for his interim suspension from the practice of law in 2000 and closed his law practice. In connection with the conviction in Count I, respondent served four months in a federal prison in Florida, followed by supervised probation for one year. He paid a $5,000 fine. For his Medicaid fraud conviction, respondent was placed on probation for five years, with one year waived because he was already on supervised probation for the federal charge. Respondent agreed to pay to the State of Louisiana $105,593.07 in criminal restitution, $35,000 in civil monetary penalties, and $25,000 in costs of investigation and prosecution. Respondent has completed both state and federal probation.
The evidence clearly shows that respondent’s family, personal, and professional life has forever changed. Respondent described this as the worst period of his life, and the committee accepted that characterization. Respondent acknowledges that he made many wrong decisions and admits *665 his fault. The committee found him to be remorseful and noted that his criminal convictions, although serious, did not arise out of his practice of law.
In each of Counts I and II, the committee determined that respondent violated Rules 8.4(b) and 8.4(c) of the Rules of Professional Conduct.
Count III (the Riley matter) — Respondent’s representation of Perry Riley resulted in a personal injury recovery, but respondent was unable to provide a comprehensive accounting of the funds after Mr. Riley’s death. Respondent admits today with the benefit of hindsight that he exercised poor judgment when he agreed to his chent’s request to oversee the disbursement and use of the settlement funds for the purpose of protecting them from the client’s adopted son. Respondent eventually accounted for the funds in March 1997, in response to requests for production of documents in a lawsuit that was filed against him by Mr. Riley’s daughter, who was also the executrix of Mr. Riley’s succession.
|7The committee determined that respondent violated Rules 1.5(c) and 1.15(b) of the Rules of Professional Conduct.[4]
Count IV (the Harris matter) — Ethel Harris did not testify at the hearing, but documentary evidence submitted by the ODC shows that she and her sister retained respondent to assist them with a real estate problem their mother was experiencing. Their mother was 98 years old, blind, and suffering from Alzheimer’s Disease. Mrs. Harris quickly experienced difficulty contacting respondent. When the desired legal services were not performed, she continued to have difficulty contacting respondent and was unable to obtain a refund of her mother’s money. From October 1996 through August 1998, Mrs. Harris made numerous attempts to contact respondent and obtain information about the progress of the legal matter; however, her attempts were unsuccessful. On August 6,1998, Mrs. Harris wrote respondent asking “for the last time” that he refund her mother’s money so she could retain another attorney to handle the matter. This effort was likewise unsuccessful, and ten days later, Mrs. Harris filed a complaint against respondent with the ODC.
Respondent’s subsequent contact with Mrs. Harris was clearly untimely. Indeed, it was two years and ten months after being discharged when respondent finally wrote to his former client advising of the services he had rendered. This was approximately seven months after Mrs. Harris’ complaint was filed. It was not until October 21, 1999 when respondent refunded the fee Mrs. Harris had paid.
The committee determined that respondent violated Rule 1.5(f)(6) of the Rules of Professional Conduct.
Count v. (the Simmons matter) — Frances Simmons did not testify at the hearing. Her complaint and related documentary evidence was submitted by the |sODC. Respondent offered testimony regarding the work he performed in the Simmons matter, which he described as “extensive.” The succession was opened, the client was placed into possession, and the property was advertised twice. An appraiser was hired to appraise the property. The entire file maintained by respondent in the matter was introduced into evidence at the hearing.
Nevertheless, the committee found that respondent clearly failed to properly corn- *666 municate with Ms. Simmons. Additionally, timing was important to accomplish the client’s desired sale of the property. This was clearly communicated by Ms. Simmons to respondent, yet he was not diligent in performing the services or advising his client of his progress. Ms. Simmons resides in Brownsville, Texas. She was greatly inconvenienced and incurred unnecessary expense in trying to contact respondent and in traveling to his office in Alexandria in attempts to see him. The property was eventually sold but not without obvious inconvenience and unnecessary stress to Ms. Simmons.
Respondent admitted at the hearing that he did not return any portion of the fee Ms. Simmons paid. He maintains the fee was earned. While he submitted evidence at the hearing of the services rendered, he never placed the disputed funds in a trust account or suggested to Ms. Simmons that the matter be submitted to fee arbitration or other alternative method of resolution. It was not proven to the committee that this fee dispute was ever properly resolved.
The committee determined that respondent violated Rules 1.3 and 1.5(f)(6) of the Rules of Professional Conduct.
Count VI (the Coats matter) — The events surrounding the Coats complaint occurred near the time respondent was surrendering his license to practice law. He could not complete the intended legal work because he was no longer practicing; however, he was financially unable to return the unearned fee and Mr. Coats filed 1 flsuit. Respondent filed an exception of prescription but then later agreed to repay his former client in monthly installments.
The committee found that the evidence offered by respondent regarding his repayment to Mr. Coats was vague and incomplete. Respondent testified that he had arranged with Mr. Coats to repay him at the rate of $100 per month.[5] Receipts of payment were referenced by respondent at the hearing, but he did not submit them to the ODC or to the committee as required by the pre-hearing order. Nevertheless, the ODC agreed and the committee permitted respondent to submit a stipulation after the hearing detailing the “hundreds of dollars” respondent paid to Mr. Coats in restitution. No such stipulation was ever received. Accordingly, the committee determined that no evidence was offered to prove the extent to which payments were made by respondent to Mr. Coats.
The committee determined that respondent violated Rules 1.3, 1.15, and 8.4(c) of the Rules of Professional Conduct.
Count VII (the Beauregard matter)■ — • Respondent represented the family of Matilda Beauregard Harvey in several earlier actions. The instant matter relates to rights of ownership and damage of property to which the client claimed an inherited ownership interest but for which no succession had ever been opened. The extensive testimony adduced at the hearing convinced the committee that despite discussions between respondent, Ms. Beauregard, and her husband, Lewis Gill, there was never a clear understanding between respondent and his client regarding the payment received by respondent, the basis for computing his fee, or the extent of the work he agreed to perform.
|10The committee found it is clear that respondent received $1,150 from Mr. Gill on April 20, 1998. The funds included $150 for the advance deposit of court costs *667 which were paid to the clerk of court, leaving $1,000 for fees. That is where any clear agreement between the parties ends. Respondent maintains that the payment was a deposit and that this fee arrangement was on an hourly basis. Neither Ms. Beauregard nor Mr. Gill understood the payment to be a deposit but believed instead that the payment was of a fixed fee.
Credible testimony by all three individuals revealed there was also a lack of agreement between respondent and the client as to the scope of the work respondent agreed to perform. It is undisputed that respondent rendered services on behalf of his clients. He went to the clerk of court’s office and obtained information and background regarding the property and its purchase. He recommended that a succession be opened and that Ms. Beauregard be recognized as the administra-trix in order to have legal authority to challenge actions taken by another heir. Respondent also recommended that a lawsuit be filed against the succession in order to recover funds expended on the succession and to resolve the issue of ownership. Respondent opened a succession and Ms. Beauregard was named ad-ministratrix; however, respondent recommended that separate counsel be retained to bring the action against the succession. Mr. Gill paid respondent an additional $450 on May 11, 1998 and respondent contacted another attorney to institute what respondent described as a “friendly action.” After having met with several family members, separate counsel advised respondent that it was doubtful the other family members would agree to asserting the claim and that they would not be filing a lawsuit. When respondent so informed Ms. Beauregard and Mr. Gill, they were unhappy and eventually sought other legal advice.
J^jRespondent’s belief that the payment was a deposit is supported by the receipt given to the client at the time of the payment which contains the description “Deposit Succession of Ethel and Rufus Beauregard.” He provided Ms. Beauregard with copies of time sheets but not until after she discharged him. Respondent explained in correspondence and at the hearing that if the case had proceeded to trial, his fee would have been $1,000 per day which he urges demonstrates that the payment was not sufficient to be a fixed fee. However, the money was not deposited into a trust account and respondent did not provide the client with routine or other billing invoices. Respondent acknowledged that he did not comply with the applicable rules in this regard.
After a complaint was filed, respondent refunded $430 of the initial payment and returned $450 he received for separate counsel to bring suit against the succession.
The committee determined that respondent violated Rules 1.4 and 1.5.
Count VIII (the McConathy matter)— Respondent testified that he searched for but could not find Mr. McConathy’s file. Documentation submitted by the ODC establishes that the Louisiana State Bar Association’s Client Assistance Fund paid Mr. McConathy $2,500 on October 31, 2001. Respondent, through counsel then representing him, agreed in July 2004 to reimburse the Fund at the rate of $100 per month until the debt and any accrued interest was paid in full. The record shows that from August 2004 until June 2005, respondent made monthly payments to the Fund of $100 each, for a total of $1,200. No explanation was given for the apparent cessation in reimbursements as of July 2005.
*668 The committee determined that respondent violated Rules 1.3, 1.4, 1.5, and 1.16(d).
| ^Considering these findings, the committee determined that respondent violated duties owed to his clients, the public, and the legal system. Respondent acted knowingly and intentionally in some instances (Counts I, II, and VI), but negligently in others (Counts III, IV, V, VII, and VIII). The conduct underlying respondent’s state conviction caused significant actual injury to the State of Louisiana. Furthermore, respondent caused actual injury to his clients in Counts III through VHI. The applicable baseline sanction for respondent’s misconduct is disbarment.
The committee found that the following aggravating circumstances are present: dishonest or selfish motive, a pattern of misconduct, multiple offenses (as to Counts I & II only), vulnerability of the victims (as to Counts III through VIII only), and substantial experience in the practice of law (admitted 1981). In mitigation, the committee recognized the following factors: absence of a prior disciplinary record, personal or emotional problems, and imposition of other penalties or sanctions (as to Counts I & II only).
Under these circumstances, the committee recommended that respondent be disbarred.
The ODC objected to the leniency of the sanction recommended by the committee, urging that permanent disbarment is appropriate.

Disciplinary Board Recommendation

After reviewing the record of this matter, the disciplinary board determined that the hearing committee’s factual findings are not manifestly erroneous and adopted same. The board applied the Rules of Professional Conduct as follows:
Counts I & II (Respondent’s federal and state criminal convictions) — Respondent violated Rules 8.4(b) and 8.4(c) of the Rules of Professional Conduct in | ^connection with his guilty pleas for violations of 21 U.S.C. § 843(a)(2), illegal use of a DEA number, and La. R.S. 14:70.1, Medicaid fraud.
Count III (the Riley matter) — Respondent violated Rules 1.5(c) and 1.15(b) when he failed to timely provide a written accounting to Mr. Riley’s family of how Mr. Riley’s settlement funds and other personal funds were disbursed and used for Mr. Riley’s care.
Count TV (the Harris matter) — Respondent violated Rule 1.5(f)(6) in this matter. Despite Ms. Harris’ demand that respondent return her $1,000 fee, he failed to place the money in his trust account during the pendency of the fee dispute, and did not actually return the fee until October 1999, over two years after her first request that the fee be returned. However, respondent did not violate Rule 1.5(f)(2) as charged. Rule 1.5(f)(2) generally provides that upon payment of a fixed or minimum fee, the funds become the property of the lawyer and may be placed in an operating account. This is the procedure that respondent apparently followed.
Count V (the Simmons matter) — Respondent violated Rule 1.5(f)(6) in this matter by failing to place disputed funds in his trust account when a fee dispute arose with Ms. Simmons. He also violated Rule 1.3 when he failed to act with diligence in representing Ms. Simmons, causing delay in both her succession matter and the accompanying sale of succession property. However, respondent did not violate Rule 1.5(f)(2) as charged. The funds initially received from Ms. Simmons were part of a fixed fee for services to be rendered in the future; as such, the funds became the property of respondent when paid. Re *669 spondent apparently placed these fees in an account other than a trust account, which complies with Rule 1.5(f)(2).
Count VI (the Coats matter) — Respondent violated Rules 1.3, 1.15, and 8.4(c) in failing to diligently represent Mr. Coats in his criminal matter and by dishonestly converting at least $4,000 of Mr. Coats’ funds to his own use. Although respondent |14claims that he has made partial restitution to Mr. Coats, no such evidence is in the record. Respondent also violated Rule 1.5(a) by charging and retaining a fee of $4,000 for work he never performed.
Count VII (the Beauregard matter)— Respondent violated Rule 1.4 in this matter by failing to properly communicate with the Beauregard/Gill family concerning the scope of his legal representation and the manner in which his fee would be calculated. He also violated Rule 1.5(f)(6) by failing to properly address the fee dispute with the family.
Count VIII (the McConathy matter)— Respondent violated Rules 1.3, 1.4, 1.5(f)(6), and 1.16(d) in this matter. Mr. McConathy paid respondent $3,500 to obtain a divorce. However, respondent did little work in the matter and failed to properly communicate with Mr. McCona-thy. Respondent also failed to provide Mr. McConathy with an accounting and initially failed to return his unearned fee. Eventually, respondent did make some restitution ($1,200) through the LSBA’s Client Assistance Fund (which had paid Mr. McConathy $2,500), but after June 2005, respondent stopped making payments to the Fund.
The board found that respondent violated duties owed to his clients, the public, the legal system, and the profession. His conduct was negligent in some instances and intentional in other instances. In Count II, injury to the State of Louisiana was significant as the amount of funds respondent fraudulently obtained from the State totaled at least $105,593.07, which is the amount of his court-ordered restitution. The harm caused by respondent to his clients and other individuals was also significant. In Count III, respondent harmed his client’s heirs by failing to promptly provide them with an accounting of the client’s settlement and personal funds. In Count IV, respondent harmed Ms. Harris by failing to return her $1,000 fee for over two years after she requested that the fee be returned. In Count V, respondent harmed Ms. 1-^Simmons by failing to diligently pursue her legal matter, and in Count VI, respondent greatly harmed Mr. Coats by failing to refund $4,000 in unearned fees to him and by failing to diligently represent him in his criminal matter. Respondent’s conduct as outlined in Count VII shows that he failed to properly communicate with the Beauregard/Gill family and failed to properly handle the fee dispute that arose with those clients. Finally, as to Count VIII, respondent harmed Mr. McConathy by failing to diligently pursue his divorce and by failing to account to him for his fee and promptly returning the unearned fee. The board agreed with the hearing committee that the baseline sanction for respondent’s misconduct is disbarment.
In mitigation, the board acknowledged the following factors: absence of a prior disciplinary record, personal or emotional problems, and the imposition of other penalties or sanctions in the criminal cases. The board found the following aggravating factors are present: dishonest or selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victims, substantial experience in the practice of law, and illegal conduct.
Turning to the issue of an appropriate sanction, the board found respondent’s conduct fits within Guideline 6 of the per *670 manent disbarment guidelines (insurance fraud, including but not limited to staged accidents or widespread runner-based solicitation). Respondent engaged in insurance fraud during his tenure as an owner of a neighborhood Medicaid clinic. He pled guilty to five counts of Medicaid fraud, based upon his submission of false claims to the Louisiana Medicaid program for services not rendered but billed to Medicaid during the period of November 20, 1997 through September 9, 1998. As a special condition of probation, respondent agreed to pay $105,593.07 in restitution to the Louisiana Medicaid program.[6]
| ^Finding this matter is similar to In re: Stoller, 04-2758 (La.5/24/05), 902 So.2d 981,[7] the board concluded that permanent disbarment is appropriate for respondent’s fraudulent insurance transactions, which “caused substantial financial loss to the State Medicaid program and also caused grave harm upon the reputation of the legal profession.”
Based on this reasoning, the board recommended respondent be permanently disbarred. The board also recommended that respondent be ordered to make restitution of unearned fees to Mr. Coats and to the LSBA’s Client Assistance Fund for monies paid to Mr. McConathy. Finally, the board recommended that respondent be assessed with all costs and expenses of these proceedings.
Neither respondent nor the ODC filed an objection to the disciplinary board’s recommendation.
DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const, art. V, § 5(B). When the disciplinary proceedings involve an attorney who has been convicted of a crime, the conviction is conclusive evidence of guilt and the sole issue presented is whether respondent’s crimes warrant discipline, and if so, the extent thereof. Supreme Court Rule XIX, § 19(E); In re: Boudreau, 02-0007 (La.4/12/02), 815 So.2d 76; Louisiana State Bar Ass’n v. Wilkinson, 562 So.2d 902 (La.1990). The discipline to be imposed depends on the seriousness of the offense and the extent of the aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Perez, 550 So.2d 188 (La.1989).
117In the instant case, respondent stands convicted of Medicaid fraud as well as illegally using a doctor’s DEA registration number for the purpose of obtaining Hydrocodone, a Schedule III controlled dangerous substance. These crimes are felonies under state and federal law, respectively, and clearly warrant serious discipline. The only issue to be resolved by this court is the appropriate sanction for respondent’s misconduct.
The documentary evidence submitted by the ODC in this case reflects that between November 1997 and September 1998, respondent submitted false and fraudulent claims to the Louisiana Medicaid program for services that were not rendered. Under these circumstances, disbarment is clearly appropriate. However, the disci *671 plinary board has recommended to us that respondent’s offenses are so egregious that he should be permanently prohibited from applying for readmission to the bar.
We agree. In Appendix E to Supreme Court Rule XIX, we set forth guidelines illustrating the types of conduct which might result in permanent disbarment. Respondent’s submission of fraudulent Medicaid claims is clearly encompassed by Guideline 6, which pertains to insurance fraud. Considering respondent’s calculated and dishonest conduct, we find that the mitigating factors present here do not justify the imposition of a sanction less than permanent disbarment.
Accordingly, we will accept the disciplinary board’s recommendation and impose permanent disbarment.[8]
|1SDECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, it is ordered that the name of Gary W. Sheffield, Louisiana Bar Roll number 11998, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. Pursuant to Supreme Court Rule XIX, § 24(A), it is further ordered that respondent be permanently prohibited from being readmitted to the practice of law in this state. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.

. Respondent was originally charged with 57 counts of Medicaid fraud and one count of felony theft; however, pursuant to a plea agreement with the State, the theft charge and 52 counts of Medicaid fraud were dismissed in exchange for respondent’s guilty plea.

. In 2002, prior to the filing of formal charges, respondent filed a petition for consent discipline, proposing that he be disbarred for his criminal convictions as well as for the misconduct at issue in some seven disciplinary investigations that were then pending. The ODC concurred in the proposed discipline, and the disciplinary board recommended that the petition for consent discipline be accepted. On May 2, 2002, we rejected the proposed consent discipline and remanded the matter for the institution of formal charges, with the instruction that on remand “the hearing committee and disciplinary board may consider recommendation of the sanction of permanent disbarment, if *664 appropriate, pursuant to Supreme Court Rule XIX, §§ 10(a) and 24, as amended effective August 1, 2001.” In re: Sheffield, 02-0781 (La.5/2/02), 814 So.2d 1293.

. Respondent conceded in his answer that "his conduct is demonstrative of severe lapses in moral judgment, and further acknowledges that his conduct justifies the imposition of a sanction of disbarment.” However, respondent specifically denied that permanent disbarment is appropriate.

. The committee also found a violation of Rule 1.5(b), which was not charged in the formal charges.

. A copy of correspondence dated September 15, 2004 from respondent to Lloyd Ray Coats states in pertinent part that respondent was not interested in "taking advantage” of his prescription defense and offered to pay Mr. Coats $100 per month.

. The board noted that respondent has completed his probated sentence, however, the record does not indicate whether he has finished paying the fines and penalties that are owed to the State.

. In Stoller, the lawyer was permanently disbarred for assisting another attorney in a fraudulent insurance scheme by posing as counsel for fictitious clients and negotiating two fraudulent settlement checks. The court specifically commented that the lawyer’s actions, designed to fraudulently obtain funds from a self-insured entity, were encompassed by Guideline 6 of the permanent disbarment guidelines.

. Because the imposition of permanent disbarment is the most severe sanction that can be imposed on respondent, having the effect of forever removing him from the bar of this state, we find it is not necessary to discuss the misconduct charged in the remaining counts of the formal charges. In re: Stephens, 07-0180 (La.4/27/07), 955 So.2d 140, citing In re: O’Keefe, 03-3195, pp. 11-12 (La.7/2/04), 877 So.2d 79, 86.